OPINION OF THE COURT
Gerard M. Weisberg, J.
On the night of October 13, 1983, a man broke into a room at the Bronx Park Motel and robbed Olga Delgado and Gabriel Vargas at gunpoint. He locked Mr. Vargas in the bathroom and then raped Ms. Delgado. After the rape, the man demanded more money. Ms. Delgado offered to take him to her house in her car, where she assured him, more money would be found. The perpetrator drove the victim to her home. There, he noticed her brother-in-law, Jose Rios, standing in the doorway and fled.
Subsequently, Mr. Vargas, Mr. Rios and Ms. Delgado positively identified claimant as the perpetrator and he was arrested. Claimant, protesting his innocence, maintained that he was at a Bible study meeting at the time of the rape/ robbery and produced a number of alibi witnesses. The defense was predicated on the theory of mistaken identity, the witnesses being Hispanic and the claimant black. The Legal Aid Society defended claimant.
After a jury trial, claimant was convicted of rape in the first degree and robbery in the first degree. On August 26, 1985, he was sentenced to an indeterminate term of 5 to 15 years in prison and began serving his sentence on that day. Subsequently, claimant’s present attorneys were substituted for the Legal Aid Society.
While in prison, additional serological tests were conducted comparing the blood type found in a semen stain on the victim’s underwear with the claimant’s blood type. Based on the results of these tests, scientific advances in the field, and additional information which had come to present counsel’s attention, they moved to vacate the judgment pursuant to CPL 440.10. Specifically, with respect to the serological material, it was alleged that the new evidence established that claimant could not have been the robber/rapist.
On December 15, 1987, Justice Burton B. Roberts, presiding in Supreme Court, Bronx County, set aside claimant’s conviction principally pursuant to CPL 440.10 (1) (g) based on "newly discovered [serological] evidence.” He specifically found that there was clear and convincing newly discovered evidence that would have exonerated claimant. Indeed, pointing to the *906 serological evidence alone, Justice Roberts stated to claimant that "the serological evidence establishes that you could not have been the individual who was the donor of the semen [found on the complainant’s underwear] and therefore could not have committed this crime.” He then dismissed the indictment in the interest of justice on the joint motion of the defense and the District Attorney citing, among other factors, the new evidence. This action pursuant to Court of Claims Act § 8-b ensued. Damages for unjust conviction and imprisonment are sought.
Claimant then moved for summary judgment with respect to liability. The State opposed the motion on, among other grounds, that it had not completed its discovery, particularly the examinations of claimant and Dr. Robert Shaler. It also cross-moved to dismiss for a failure to state a cause of action. Pursuant to CPLR 3212 (f) and Zuckerman v City of New York (49 NY2d 557), by an interim opinion and order dated June 15, 1990, we adjourned the motions pending the completion of discovery. That has now been accomplished.
Based thereon, we find that there is no question of fact as to the following. The CPL 440.10 motion was held on November 23 and December 1, 1987, before Justice Roberts. With the consent of the court and the parties, it was agreed that the issues relating to the serological evidence would be considered first and the District Attorney would then determine its position based on what was adduced.
Justice Roberts first heard testimony that prior to the criminal trial, an evidentiary Frye hearing had been held before Justice David Levy to determine the admissibility of certain anticipated scientific evidence. (See, Frye v United States, 293 F 1013 [1923].) At that proceeding, Dr. Robert Shaler, Director of Serology of the Office of the Chief Medical Examiner for the City of New York, testified that he had examined stains in the rape victim’s panties and concluded that sperm was present. He then determined, through separate tests of Ms. Delgado and the claimant, that they were both "secretors” (i.e., they belonged to the 80% group of the population wherein blood group substances are found in all bodily fluids), and that Ms. Delgado was blood type B, and that the claimant was blood type A. Dr. Shaler then tested the panty stain and found blood group substances B and H meaning that the donors (i.e., the rapist and Ms. Delgado) could be blood types B or O. Since the claimant was blood type A, Dr. Shaler concluded, in a report dated April 18, 1984, that *907 Marion Coakley could not be responsible for the sperm present in the victim’s panties. Inasmuch as Ms. Delgado denied having sex with anyone except the rapist that day, the rapist could be the only person responsible for the presence of sperm.
Subsequent to his written report, however, Dr. Shaler had second thoughts. He reasoned that because the claimant was a "low level” secretor, it could have been possible that his secretion level was so low on any given day that the tests were not sensitive enough to detect their presence. Therefore, at the Frye hearing he qualified his original finding by stating that additional tests needed to be performed to confirm the findings, and that without such confirmation he could not adhere to his April 18, 1984 conclusion to a reasonable degree of scientific certainty. The defense attorney had not undertaken to have those tests performed although arguably he should have been on notice of the potential problem several months earlier. The court, not wishing to delay the trial any longer, refused to adjourn the case so that the tests could be performed. Based on Dr. Shaler’s inability to offer an unqualified opinion concerning the conclusions to be drawn from the tests, all serological evidence was suppressed at trial, notwithstanding its potential to completely exonerate the claimant.
Dr. Shaler also testified before Justice Roberts. He stated that subsequent to claimant’s conviction he conducted further tests which showed that claimant’s secretion levels never went so low as to be undetectable. Moreover, independent studies by other experts in the field had confirmed that an individual’s secretion levels do not vary significantly. Thus, Dr. Shaler determined that his original examination results were correct, and that he could state, with a reasonable degree of scientific certainty, that claimant was excluded as a possible donor of the sperm present in the victim’s panties.
The District Attorney then joined with the defense in requesting that claimant’s conviction be vacated and the indictment dismissed. In its application, the People stated: "Whether it is examined as newly discovered evidence, ineffective assistance of trial counsel, or error of the trial court, the serological evidence should have been presented to the jury, and upon any or all grounds, the judgment of conviction must be vacated.” In addition, based on this evidence, a palm print and the other material which had not been made available to the defense, and would presumably be offered at a retrial, the *908 District Attorney concluded that it could not sustain its burden of proof and moved for a dismissal. (Cf., CPL 210.40.)
The State opposes claimant’s motion on several grounds. We will treat them seriatim. First, the State argues that the serological evidence which served in large part as the basis for the vacatur of claimant’s judgment was not newly discovered, Justice Roberts’ characterization of it as such notwithstanding. It reaches this conclusion on the theory that the additional blood tests Dr. Shaler conducted after claimant’s conviction could and therefore should have been done prior thereto. As to the subsequent advances in scientific knowledge, defendant asserts that they had in fact been first published prior to the Frye hearing. Therefore a question of fact requiring trial exists as to whether Dr. Shaler should have known of them.
While we have serious doubts as to the correctness of the State’s analysis of whether the serological evidence was newly discovered within the meaning of CPL 440.10 (1) (g), we need not decide the issue. Justice Roberts determined that it was. Although under Court of Claims Act § 8-b, we may be able to say that a vacating court or reversing tribunal did things for reasons in addition to those stated, that is not to say that we can ignore that which was done or the reasons given for doing it. Justice Roberts found the serological evidence to be newly discovered and explicitly vacated the judgment based in large part thereon. It was therefore newly discovered within the meaning of CPL 440.10 (1) (g). Inasmuch as that paragraph is one of the enumerated statutes in Court of Claims Act § 8-b (3) (b) (ii), the vacatur of the judgment satisfies that provision of the act unless, as the State next argues, Justice Roberts’ consideration of the related ineffective counsel and lack of due process grounds invalidates it. In other words, as we understand defendant’s argument, since ineffective assistance of counsel and denial of due process are not approved grounds under that clause of section 8-b, the vacatur based even in part thereon does not qualify for relief.
First, we reject the notion that judgments vacated or reversed on due process grounds ipso facto are without the act. While section 8-b does exclude claimants whose convictions were overturned for constitutional violations in general (compare, Court of Claims Act § 8-b [5] [b] [ii], with CPL 440.10 [1] [d], [h]), the underpinnings of most, if not all, of the specifically approved paragraphs are also constitutional in nature. (See, Gordon v State of New York, 141 Misc 2d 242.) For example, is not a conviction obtained as the result of the *909 fraud or duress of a court or prosecutor or upon perjured testimony one obtained in violation of the accused’s due process rights? (See, CPL 440.10 [1] [b], [c]; Mott v State of New York, 138 Misc 2d 916.) Yet these are approved grounds. Why then are some constitutionally mandated reversals within the statute while others not? The answer may be found in its legislative history.
The New York Law Revision Commission found that judgments were often reversed or vacated on constitutional grounds having little to do with innocence. (1984 Report of NY Law Rev Commn [Report], 1984 McKinney’s Session Laws of NY, at 2928-2929.) For example, the commission observed, illegally seized evidence might justify a reversal but, at the same time, provide no evidence that the claimant was innocent. (Ibid) The Legislature, therefore, included as a precondition to obtaining relief under section 8-b that the vacatur or reversal be under a ground evidencing innocence whether constitutionally mandated or not. (See, Court of Claims Act § 8-b [5] [b] [ii].) Thus, the test is not whether an overturning court labels prior errors as being due process violations but what exactly the violations were, where they fit into the CPL 440.10 scheme and to what extent they evidence innocence.
In fact, although little discussed in the case law, that is exactly what section 8-b directs us to do with respect to reversals under CPL 470.20 (1). That provision authorizes an intermediate appellate court to reverse and remand a conviction for errors which "deprived [the defendant] of a fair trial” or in the "interest of justice”. Section 8-b then tells us that such a claimant will still qualify for relief if but only if the grounds relied on were those set forth as acceptable under CPL 440.10. In other words, notwithstanding a reversing tribunal’s labeling of the basis for its decision as a denial of due process or an equivalent phrase, provided that the grounds employed satisfied (or possibly could satisfy) the approved paragraphs of CPL 440.10, the claimant is eligible for relief. That this may require us to look behind a decision cannot be denied. But again, that is not to say we can change what has been done or subtract grounds already determined. We do, however, have a statutory obligation to reevaluate what was done in light of the requirements of section 8-b to see if its preconditions have been met.
Moreover, the same analysis applies with respect to claims of ineffective assistance of counsel. The presence of such a finding in a vacating or reversing court’s decision *910 should not automatically disqualify the claimant. Rather the inquiry must be what evidence did such ineffective counsel fail to adduce or exclude and where does that material fall in the section 8-b list of prerequisites.
Applying the foregoing, while Justice Roberts tangentially based the vacatur on the ineffective assistance of claimant’s Legal Aid attorney and the Trial Judge’s improper denial of an adjournment in order for Dr. Shaler to perform the additional serological tests, the result of both was that overwhelming evidence of claimant’s innocence was excluded from the trial. This satisfies section 8-b.
The State next asserts that claimant, through the negligence of his Legal Aid attorney, brought about his own conviction. Apparently defendant is arguing that the attorney’s negligence in failing to arrange for additional serological testing should be imputed to claimant. We disagree.
Court of Claims Act § 8-b (5) (d) requires that a claimant establish by clear and convincing evidence that he or she did not cause or bring about the conviction. In its report, the Law Revision Commission listed five examples of misconduct that would bar relief under this paragraph. These are giving an uncoerced confession of guilt, removing evidence, attempting to induce a witness to give false testimony, attempting to suppress testimony or concealing the guilt of another. (Report, 1984 McKinney’s Session Laws of NY, at 2932.) We have held this list to be illustrative and found other, yet similar, conduct to have violated the provision. (Moses v State of New York, 137 Misc 2d 1081 [offering a false alibi]; see also, Alexandre v State of New York, NYLJ, Mar. 31, 1989, at 24, col 1 [willingness to work with unlicensed handgun within reach contributed to conviction for illegal possession], affd on other grounds 168 AD2d 472, appeal dismissed 77 NY2d 925; Vann v State of New York, NYLJ, Apr. 30, 1990, at 28, col 3 [knowing receipt of property stolen from victim contributed to murder conviction].)
In all of these cases, and the commission’s illustrations, the claimant was or would have been individually engaging in wrongful conduct or, in the case of a confession, admitting guilt. To be contrasted is a case like Lanza v State of New York (130 AD2d 872, 874) where the Third Department rejected the argument that the claimant’s failure to testify at trial contributed to his conviction. That tribunal said "We do not believe that the Legislature intended such second-guessing *911 of trial strategy in determining whether a person contributed to his conviction, especially in light of the examples of misconduct cited by the Law Revision Commission.” (Lanza v State of New York, supra, at 874.) Even assuming we imputed the Legal Aid’s alleged negligence to claimant (which we think unwarranted), claimant neither admitted guilt nor engaged in wrongful conduct. The most that can be said is that he would be guilty of negligent trial preparation. This is more akin to an error of trial strategy than the wrongful conduct which the Legislature was attempting to avoid compensating when it enacted section 8-b. (See, Ivey v State of New York, Ct Cl, Mar. 12, 1990, NeMoyer, J. [appeal pending].)
Defendant also argues that claimant made statements to the Grand Jury which were at odds with what his alibi witnesses testified to at trial, thereby contributing to his conviction. The simple answer is, as claimant’s counsel points out, that it could hardly have been inconsistent since the prosecution declined to offer it at the criminal trial. In any event, the fact that it was not introduced establishes that any alleged inconsistency could not have contributed to his conviction.
Lastly, the State asserts that there exist questions of fact which require a trial and therefore prohibit the granting of summary judgment, namely, to what extent the Legal Aid’s alleged negligence caused the conviction.
Implicit in this argument is the theory that the State may avoid liability to the extent it establishes that the Legal Aid’s alleged negligence caused the conviction, even where not imputed to the claimant. To be clear, the issue of contribution or indemnity vis-á-vis the State and the Legal Aid Society is not before us and we are therefore not passing on it. The question is, assuming the conviction was caused in whole or in part by the negligence of the Legal Aid attorney in presenting a defense, what effect does that have on the State’s liability to the claimant? While we agree with the Assistant Attorney-General that this is a case of first impression, we think the answer is none.
Referring again to the legislative history of section 8-b, the statute was enacted as a response to the perceived inequities which existed under prior law with respect to innocent people who were convicted of crimes. Traditionally their only recourse was through private statutes or actions for false arrest or malicious prosecution where many of the participants were absolutely or qualifiedly immune. (Report, 1984 McKinney’s *912 Session Laws of NY, at 2906-2914.) To rectify this the commission proposed legislation which would compensate the innocent who had been wrongfully convicted regardless of fault or a lack thereof by the Judge, prosecutor or other local participants. Moreover, since the District Attorney was representing the People of the State, it was concluded that if compensation was warranted, it should be paid by the State despite the prosecutor’s local municipal employment. (Report, id., at 2922-2926.)
Applying the foregoing, as the District Attorney prosecuted on behalf of the State, claimant’s Legal Aid attorney was appointed pursuant to the mandates of the Constitutions of this State and the United States. Both counsel were part of the same system. Since the State would not be able to avoid liability even were it able to ascribe the conviction to the wrongdoing of a local prosecutor, it should not be able to avoid it were it able to assign the fault to a court-appointed defense attorney.* [The court then concluded that the serological evidence and other undisputed facts established all elements of claimant’s cause of action and granted his motion for summary judgment on the issue of liability.]
[Portions of opinion omitted for purposes of publication.]

 Whether the result would be the same had the defense counsel been privately retained is an issue which we do not address.